Filed 9/23/20  Odulate v. Harkins CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| MOBOLANLE ODULATE,<br><br>　　　　Plaintiff and Appellant,<br><br>v.<br><br>BILL HARKINS, et al.,<br><br>　　　　Defendants and Respondents. | A155889<br><br>(City & County of San Francisco<br>Super. Ct. No. CBC17556590) |

Plaintiff Mobolanle Odulate brought this action alleging tenant harassment in violation of section 37.10B of San Francisco's Residential Rent Stabilization and Arbitration Ordinance (S.F. Admin. Code, ch. 37, § 37.10B (Rent Ordinance), threats in violation of her civil rights (Civ. Code, § 52.1), assault, and negligence.  The jury found against her and in favor of the building's owner, John Wai, Wai's living trust, and Wai's real estate broker, Bill Harkins, on all causes of action presented to it.  Plaintiff contends that the verdict was not supported by substantial evidence, that the trial court committed instructional error regarding the law of landlord-tenant relations, and that it erred in not allowing the jury to consider her cause of action for negligence.  We shall affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND[1]

### *The Rental*

Plaintiff moved into an apartment on Fulton Street in San Francisco in 2015. She booked the unit through the rental platform AirBNB; she rented one room in a five-room apartment, with shared use of common areas. Her rent was $2,000 a month.

Iskra Astudillo was the AirBNB host. He leased all six apartments in the building from Wai on a month-to-month basis, and rented the bedrooms out through AirBNB. Most of the rooms were used by tourists rather than long-term residents.

### *Plaintiff's Testimony*

By early 2016, plaintiff was having difficulties paying rent. In March 2016, Astudillo told plaintiff she could pay the rent to him directly, and they set up a payment plan with the understanding that plaintiff would apply for rental assistance. Astudillo made multiple requests for plaintiff to pay rent but, except for $800, she made no further rent payments. By the summer, Astudillo was informing plaintiff the room was fully booked for the summer and asking her to leave.

Plaintiff testified that in September 2016, she received text messages from Astudillo saying they were her three-day notice to quit the premises. In October 2016, Astudillo served plaintiff with a "proper" three-day notice. By that time, he had asked her many times to pay the rent or move out.

---

[1] We remind defendants of their duty to support factual assertions with citations to the record by volume and page number. (Cal. Rules of Court, rule 8.204(a)(1)(C); see Respondents' Brief at pp. 7–9, 18, 22–26.) That obligation extends not only to matter found in the reporter's transcript but also to that found in the clerk's transcript or, in this case, the appendix in lieu of clerk's transcript. (*Id.*, rule 8.124.)

Astudillo then sent plaintiff an email offering either to allow her to stay in the apartment as the AirBNB host or to forgive her back rent and sign a lease, and telling her, " 'All the messages and steps we took in this last month or two are all pressure from upstairs and from the owners.' " She told him she needed time to consider his offer, and before she responded to him, Astudillo announced all six units in the building were being closed down. A notice was posted on the door giving a deadline to move out of January 1, 2017. On December 31, 2016, plaintiff told Astudillo she was not moving out.

Plaintiff called the police on January 1, 2017, and they came that morning. The same morning a mover, Martin, sought to take all the furniture from the building, including plaintiff's bedroom, but ceased when the police intervened. Martin also turned off the electricity to the building, but turned it back on at the direction of the police a couple of hours later.

Later the same day, plaintiff received an email from Harkins, indicating he was writing on behalf of the building's owner and stating that Astudillo had told him plaintiff was a trespasser, not a tenant, and—falsely, she testified—that she had not been in the apartment as of December 21, 2016. The email said that if they could not come to an agreement, Harkins would come with the police and press trespassing charges, and told her the police had advised him he had the right to use whatever force was necessary if he found a trespasser in an empty apartment.

In the early afternoon of January 2, 2017, Martin again turned off the power to the building, then turned it on again. Later that day, Harkins— whom plaintiff understood to be one of the owners of the building—went into the apartment and banged on plaintiff's bedroom door, saying that he would break the door down if she did not open it. He said he would call the police, and plaintiff asked him to do so. When the police arrived, they questioned

3

plaintiff, and she heard Harkins tell them she was a "professional con woman." She could later hear the police speaking with Astudillo on the phone. The police told Harkins they would not remove her and that they would arrest him if he did so himself.

After the police left, Harkins told plaintiff he was willing to go to jail to get rid of her. Plaintiff did not respond, and Harkins said, "I'm going to come back with a gun." He then sat on her bed in a "crumbled pose" and asked why she had not replied to his email. He made a number of offers to get her to leave the apartment, including renting a hotel room for her and giving her $2,000. She said she would get back to him the next day.

A friend of plaintiff's, who was on the telephone with her during this incident and could hear the conversation, confirmed that Hawkins made a comment about coming back with a gun.

Plaintiff sent Harkins an email on January 4, 2017, telling him she was working with someone at a tenant's union and that she was looking for an attorney. The email he sent in response referred to her as a "squatter," and said she had committed "criminal trespass invasion." The email also referred to a neighbor who was allegedly a "dangerous criminal running a bike chop shop and meth lab" and who was going to burn the building down.

Later that evening, Harkins came to the apartment. Plaintiff called 911 on her speakerphone; when Harkins heard her, he yelled, "Squatter," and left the apartment. The next day, he sent her an email telling her he did not have to give notice to enter the apartment.

On January 19, 2017, a handyman who worked in the building, Pang, showed up and turned off the power. He yelled at plaintiff and swung his arms wildly, close to her face. She called the police; they left without doing anything. Pang followed plaintiff to her bedroom door and put his boot in the

4

door to prevent her from closing it. Pang spoke on his phone in what sounded like a Chinese language, then backed away from the door. Pang then changed the locks on the other bedroom doors. Plaintiff later saw that the dryer had stopped working. Over the next few days, people painted the building, and the fumes made plaintiff feel sick. Harkins and others entered the apartment between six and 12 times after February 1, 2017.

Astudillo filed an eviction action against plaintiff in March 2017. Plaintiff and Astudillo reached a settlement in May 2017, under which she moved out on July 11, 2017.

### *Harkins's Testimony*

Harkins is a licensed real estate broker. He worked as a real estate broker for many properties owned by John Wai, including the property at issue here. Wai leased the property to Astudillo in 2015. It was stipulated that Harkins acted as Wai's agent. Wai, who was approximately 97 years old, did not testify at trial.

Before Astudillo leased the property, squatters from a building next door had occupied it; when police officers removed them, they found guns, burglary equipment, stolen bicycles, and drug paraphernalia. Even after being removed, the squatters kept returning until Astudillo leased the building for AirBNB rentals.

Harkins denied that he acted on behalf of Astudillo. In September or October 2016, Astudillo asked Hawkins for advice on how to handle the situation with plaintiff, and Harkins advised him to talk to an attorney. During December 2016, Harkins looked through the apartment and saw that plaintiff's room did not look occupied. He considered plaintiff a trespasser based on the information Astudillo had given him, which was that plaintiff "kept coming and going, breaking in, coming and going." Harkins advised

5

Astudillo to turn off the electricity as he normally would when vacating a building.

On January 2, 2017, Harkins went to the apartment because the police said they needed a representative of the owner present in order to remove a squatter. He asked plaintiff whether she had proof that she was a tenant, and she said no. He acknowledged saying something about returning with a gun, but said he made the comment to the police officers as "a joking term."

Harkins testified that after the police left on January 2, he went to plaintiff's door, and she motioned to him and he sat on her bed, the only place to sit in the apartment. Plaintiff said Harkins had been calling her terrible names and she needed to go to the emergency room, and Harkins offered to drive her, telling her he did not want any physical harm to come to her over the apartment. Plaintiff then said she did not need to go to the emergency room. Harkins offered to give her $2,000 and pay for her to stay in a hotel room for two weeks. She said she needed to think about it. A few minutes later, plaintiff refused Harkins's offer, and he warned plaintiff of the danger of squatters returning to the apartment and made sure she knew how to lock the doors securely.

The next day, January 3, 2017, after hearing about "something going on," Harkins went to the apartment and checked to see if anyone was in any of the rooms. A few days later, Harkins went to the building and saw evidence that someone had broken into one of the other apartments and someone had broken into the lockboxes.

On January 7, Harkins sent an email to Astudillo saying that the "right thing to do is go after this woman," that a "larger lawsuit" would cost money, and that he had sent the police additional information. Astudillo responded,

"I agree. I want to make her life hell without it costing us too much. Got the info. You're a rock star. Thanks."

Harkins testified that he was aware he did not have the right to remove plaintiff from the building physically, but that police officers had told him he could use whatever force was necessary and that he had so informed plaintiff in an email.

Harkins had also been the agent for leasing other apartments owned by Wai to Astudillo. During email communications with Harkins, Astudillo said he would offer plaintiff money, and continued, "I don't want any problems or issues since I still plan to do more business with you . . ."

***Astudillo's Testimony***

Astudillo testified that plaintiff paid rent for her room through AirBNB for about two and a half months after she first rented it in September 2015. About a month and a half after her AirBNB reservation ended, plaintiff sent Astudillo $800. She promised to make more payments but never did so. She also promised to leave the apartment.

In September 2016, Astudillo and his business partner sought Harkins's advice about how to evict plaintiff. Harkins suggested they work with a lawyer and recommended one. In October, Astudillo served plaintiff with a three-day notice to quit the premises.

After San Francisco's short-term rental laws changed, Astudillo decided to go out of business as an AirBNB host. He came to an agreement with Wai that he would vacate the property at the end of the year and turn it back over to Wai. In late October or early November 2016, Astudillo posted a notice that he would be vacating the building as of January 1, 2017. On December 31, plaintiff told him she would not be moving out. Because the apartment

was not vacated, Astudillo continued to pay rent to Wai until plaintiff moved out in July 2017.

On January 2, 2017, Astudillo wrote an email to Harkins telling him the "squatter" had come back to the building and convinced the police she had a tenancy. He indicated plaintiff had not stayed in the apartment consistently: the first time she "reappeared" after March was in July. She broke in and squatted in September and stayed for three weeks, she squatted a few weeks in November, then moved out and disappeared, and she came back to the building in December. Astudillo's information was based on reports from the maids who cleaned the other rooms after guests vacated them.

### *The Verdicts*

The jury found in favor of defendants on all causes of action presented to it. Specifically, it found Harkins did not violate Section 37.10B of the Rent Ordinance. As to the cause of action under Civil Code section 52.1, the jury found that although Harkins made threats of violence against plaintiff or her property, his threats did not cause her to believe reasonably that if she exercised her right to remain in the unit, he would commit violence against her and had the apparent ability to do so. Finally, on the cause of action for assault, the jury found Harkins did not threaten to touch plaintiff in a harmful manner. The cause of action for negligence was not presented to the jury. The trial court entered judgment in favor of defendant.

### DISCUSSION

### I. The Rent Ordinance

Section 37.10B of the Rent Ordinance, entitled "Tenant Harassment," prohibits a "landlord" or any "agent, contractor, subcontractor or employee of the landlord" from doing various acts "in bad faith." (Rent Ordinance,

8

§ 37.10B(a).)  The prohibited acts include interrupting or failing to provide required housing services; abusing a landlord's right of access into a rental housing unit; using fraud, intimidation, or coercion to influence a tenant to vacate a housing unit; threatening the tenant by word or gesture with physical harm; and interfering with the tenant's right to quiet enjoyment of the unit or right to privacy.  (*Ibid*.)

The ordinance defines a landlord as "[a]n owner, lessor, sublessor, who receives or is entitled to receive rent for the use and occupancy of any residential rental unit or portion thereof in the City and County of San Francisco, and the agent, representative or successor of any of the foregoing." (Rent Ordinance, § 37.2(h).)  A tenant is defined as "[a] person entitled by written or oral agreement, sub-tenancy approved by the landlord, or by sufferance, to occupy a residential dwelling unit to the exclusion of others." (*Id*., § 37.2(t).)

## II.  Instruction on Landlord-Tenant Relationship

The trial court instructed the jury:  "[A]s between a property owner and a sublessee, there is no tenancy relationship.  In this case [Mobolanle] Odulate was a sublessee of Iskra Astudillo.  Ms. Odulate was not a tenant of the owner John [Wai]."

During its deliberations, the jury asked for the legal definition of the terms landlord and tenant.  It appears the trial court provided the definitions found in the rent ordinance.  No party had previously asked for the jury to be instructed pursuant to the Rent Ordinance's definitions of landlord and tenant.

Plaintiff acknowledges that the instruction originally given is a correct statement of California law, in that "[a] subtenant generally has neither privity of estate nor privity of contract with the original lessor."  (*Syufy*

9

*Enterprises v. City of Oakland* (2002) 104 Cal.App.4th 869, 885 (*Syufy*); see *Johnson v. Couch* (1961) 189 Cal.App.2d 687, 691 [no relation of tenancy between head landlord and sublessee].) She contends, however, that the instruction should not have been provided in this case because this general rule does not apply to the Rent Ordinance.

Plaintiff argues that under the Rent Ordinance's definitions of landlord and tenant, Harkins and Wai could properly have been found to be her landlord for purposes of liability under the Rent Ordinance. Accordingly, she contends, it was error for the court to instruct the jury under the general rule that there is no tenancy relationship between an owner and a sublessee. Her position is that Harkins could be found to have violated her rights under the Rent Ordinance in two ways: first, in that he met the Rent Ordinance's definition of a landlord and therefore had direct obligations to her, which he violated by trying to force her to leave the apartment; and second, in that he acted as on behalf of Astudillo—plaintiff's direct landlord—in these efforts.

Under the circumstances before us, we reject plaintiff's contention that the trial court committed prejudicial error. First, "[w]hen a trial court gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given." (*Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 (*Suman*); see *Scofield v. Critical Air Medicine, Inc.* (1996) 45 Cal.App.4th 990, 1010–1011.) Although plaintiff objected to the instruction below on the ground Wai was her landlord, on appeal she does not dispute that the instruction correctly expressed the general rule that under California law, there is no tenancy relationship between a property owner and a sublessee.

10

In any case, we are not persuaded that the instruction was incorrect even under the Rent Ordinance's definition of landlord and tenant. It is true, as plaintiff says, that Wai falls within the ordinance's definition of *a* landlord—that is, he is the owner of a building, who receives rent for the use of a residential unit—and that plaintiff falls within the definition of *a* tenant. (Rent Ordinance, § 37.2(h) & (t).) But nothing in the Rent Ordinance evinces an intent to abrogate the general California rule that, as between an owner and a subtenant, there is no landlord-tenant relationship—that is, that Wai was not *plaintiff's* landlord. (Compare *Cobb v. San Francisco Residential Rent Stabilization & Arbitration Bd.* (2002) 98 Cal.App.4th 345, 348, 352–353 (*Cobb*) [after tenant moved out, leaving her adult son in apartment, landlord accepted son as his tenant, not subtenant, by requesting and receiving rent and negotiating rent increase].) Indeed, the Rent Board's own interpretation of the ordinance suggests otherwise.[2] In its "Subtenant Petition" form, the Board explains: "If you are not a party to the rental agreement with the property owner/manager but you pay rent to a master tenant, you are a subtenant and the master tenant is your landlord. Since *you do not have a landlord-tenant relationship with the owner/manager*, you must assert any claims concerning your rent against the master tenant." (Italics added.) (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381 [in construing a statute, we consider the interpretation of the agency charged with implementing it].)

Plaintiff's reliance on *DeZerega v. Meggs* (2000) 83 Cal.App.4th 28, does not persuade us otherwise. The court in *DeZerega* concluded a subtenant was

---

[2] We grant defendants' request for judicial notice of the San Francisco Rent Stabilization and Arbitration Board's (the Rent Board) "Subtenant Petition" form.

entitled to the eviction control protections of Berkeley's rent control ordinance, which defined " 'tenant' " to mean " 'any *renter*, tenant, *subtenant*, lessee, or *sublessee* of a rental unit, or *successor to a renter's interest*, . . . or *any other person entitled to the use or occupancy of such rental unit*.' " (*Id*. at p. 39.) This definition is broader than that in the ordinance before us, which applies only to one "entitled to occupy a dwelling unit by written or oral agreement, sub-tenancy *approved by the landlord*, or by sufferance." (Rent Ordinance, § 37.2(t), italics added.) In any case, the question before us is different from that in *DeZerega*: not whether plaintiff was entitled to the Rent Ordinance's eviction control measures, but whether the jury was properly instructed that she was not Wai's tenant. Whether or not plaintiff was entitled to the eviction protections of San Francisco's Rent Ordinance, we see no error in a conclusion that the tenancy relationships ran between plaintiff and Astudillo on the one hand, and Wai and Astudillo on the other, not between plaintiff and Wai.

Plaintiff suggests, however, that the evidence would support a conclusion that she became defendants' direct tenant as of December 31, 2016, when, she asserts, Astudillo surrendered his lease. We are unpersuaded. As plaintiff acknowledges, there was no privity of contract between her and defendants, and the evidence was uncontroverted that Astudillo in fact did not deliver a vacant building on the agreed-upon date and that he continued to pay rent for the apartment until plaintiff finally vacated it. Nor is there evidence that, as in *Cobb*, Wai accepted plaintiff as his tenant by requesting or receiving rent from her. (*Cobb*, *supra*, 98 Cal.App.4th at pp. 352–353.)

We accordingly reject plaintiff's claim of error on this ground.

12

### III. Substantial Evidence of Agency

Plaintiff contends the record lacks substantial evidence to support a finding that Harkins was not aiding and abetting Astudillo or acting as his agent; as a result, she argues, as a matter of law Harkins was liable under the Rent Ordinance. This is shown, she contends, by the facts that Harkins advised Astudillo to turn off the electricity and that he went to the property on January 2, 2017, as he believed was necessary to have the police remove plaintiff. In considering such a challenge, we review the evidence in the light most favorable to the prevailing party, and determine whether there is any substantial evidence, whether or not contradicted, to support the judgment. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266 (*ASP Properties*).)

This claim fails. It is undisputed—indeed, it was stipulated—that Harkins acted on behalf of Wai, the building's owner. Plaintiff has not met her burden to show the evidence compels a conclusion that Harkins was simultaneously acting on behalf of Astudillo or aiding and abetting Astudillo when he went to the building on January 2, 2017. There is no evidence Harkins agreed to assist Astudillo or that his actions were intended to accrue to Astudillo's benefit, except to the extent Astudillo's interests overlapped with Wai's.

In any event, even if the evidence had established that Harkins aided and abetted or acted as an agent of Astudillo, that would not establish plaintiff's right to any judgment as a matter of law. The special verdict form for the only cause of action to which this question is relevant, that for tenant harassment, did not ask the jury to find whether Harkins was Astudillo's

13

agent or whether he aided and abetted Astudillo.[3]  Rather, the form asked simply whether defendants violated section 37.10B of the Rent Ordinance. The instructions told the jury that a violation of the ordinance took place if a landlord or landlord's agent did any of the prohibited acts *in bad faith*.  Here, there was evidence that Astudillo told Harkins that plaintiff was a trespasser or a squatter, that Harkins had visited the apartment in December 2016 and plaintiff's room appeared unoccupied, and that the property had, indeed, had a problem with squatters in the past.  On this record, rather than concluding Harkins did not act on behalf of or to assist Astudillo, the jury might well have concluded Harkins did not violate the Rent Ordinance because he acted in the good faith belief plaintiff was not a tenant but a trespasser.  The evidence might have supported a contrary conclusion—that Harkins knew plaintiff was a tenant of Astudillo, entitled to the protections of the Rent Ordinance—but we cannot say there is no substantial evidence to support the conclusion that Harkins did not violate the Rent Ordinance because he acted good faith.  (See *ASP Properties*, *supra*, 133 Cal.App.4th at p. 1266.)

## IV.    Instruction on Negligence

One of plaintiff's causes of action was for negligence, based on an allegation that defendants negligently interfered with her right to quiet enjoyment.  Defendants included instructions on negligence in their requested jury instructions, and plaintiff argued the instructions should be given.

---

[3] The other causes of action asked whether Harkins threatened violence against plaintiff and whether he threatened to touch her in a harmful manner.  The jury found that although he threatened violence, he did not cause a reasonable belief he would commit violence and was able to do so, and that he did not threaten to touch her in a harmful manner.

The trial court, however, declined to instruct the jury on negligence.  In doing so, it concluded there was no evidence to support such a theory.  That is, according to the court, there was no evidence defendants' actions were negligent, rather than intentional.  Plaintiff argued that her theory was that the Rent Ordinance set the standard of conduct, and defendants negligently violated her rights under the ordinance.  The trial court rejected this argument on the ground that a violation of the relevant portion of the Rent Ordinance, section 37.10B, required bad faith conduct.

Plaintiff contends the trial court erred in refusing to instruct the jury on a theory of negligence, because intentional conduct may also give rise to a cause of action for negligence.  (See *American Employer's Ins. Co. v. Smith* (1980) 105 Cal.App.3d 94, 101 (*American Employer's*) [minor's action in intentionally setting fires could support cause of action for negligence, for which insurer must provide coverage].)  While recognizing this principle, we conclude it does not assist plaintiff here.

The elements of a cause of action for negligence are a duty of care, a breach of duty, and an injury proximately caused by the breach.  (*Lichtman v. Siemens Industry Inc.* (2017) 16 Cal.App.5th 914, 920.)  Plaintiff fails to show the evidence meets this standard.

First, plaintiff's complaint alleged defendants' actions interfered with her right to quiet enjoyment of the unit.  But the covenant of quiet enjoyment, implied in every lease, requires the *landlord* to refrain from activity that interrupts the tenant's enjoyment of the leased property.  (Civ. Code, § 1927; *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004, 1034 (*Spinks*); *Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131, 138.)  And, as discussed, plaintiff sublet the apartment from *Astudillo*, not from defendants, and under both general California law and

15

the Rent Ordinance, an owner is not the landlord of a subtenant.  (*Syufy, supra*, 104 Cal.App.4th at p. 885.)

Relying on *Marchese v. Standard Realty & Dev. Co.* (1977) 74 Cal.App.3d 142, 147, plaintiff argues in passing that an owner may be liable to a subtenant for breach of the implied covenant of quiet enjoyment; but *Marchese* limits that rule to situations in which the owner has expressly agreed to the sub-tenancy of the named party, thus making a subtenant a third-party beneficiary to the covenant of quiet enjoyment in the original lease.  (Accord, *Spinks, supra*, 171 Cal.App.4th at p. 1028 [fact that lease named occupant by name raised inference it was intended to benefit her personally].)  Furthermore, plaintiff provides no authority that a breach of the implied covenant of quiet enjoyment, absent a wrongful eviction, gives rise to a tort cause of action for negligence.  (See *Bevis v. Terrace View Partners, LP* (2019) 33 Cal.App.5th 230, 250–251 ["California case law has recognized a tort cause of action for wrongful eviction, including breaches of the covenant of quiet enjoyment that compel a tenant to vacate, whereas breach of covenant of quiet enjoyment that does not result in a wrongful constructive or actual eviction is a breach of contract"]; accord, *Ginsberg v. Gamson* (2012) 205 Cal.App.4th 873, 898–902.)

In the circumstances before us, plaintiff has not shown either that Wai and Harkins owed her a duty of quiet enjoyment or that they can be held liable for a negligent breach of such a duty.

Plaintiff argued in the trial court that Harkins may be liable in tort because he acted on behalf of Astudillo, plaintiff's landlord.  But even if Harkins could be seen as acting on behalf of plaintiff's landlord, plaintiff has not shown the evidence supports a theory of negligence.  The duty of care she articulated to support a tort cause of action for breach of the covenant of quiet

16

enjoyment was that required of landlords under the Rent Ordinance, and the only violation she alleged was of the provision prohibiting tenant harassment, section 37.10B.  But, by its terms, the Rent Ordinance requires bad faith conduct, rather than mere negligence, for a violation of this prohibition.  (Rent Ordinance, §37.10B.)  As a result, *American Employer's* does not assist plaintiff.  Unlike the action of the teen who set fires there, mere negligence here is insufficient to support liability for violation of the prohibition on tenant harassment.  (See *American Employer's*, *supra*, 105 Cal.App.3d at p. 101.)

Plaintiff attempted to avoid this problem in the trial court by arguing that the Rent Ordinance as a whole provides the applicable standard of care, and that Harkins "violated the entire Rent Ordinance[,] not just [section] 37.10B."  But she points to no other portion of the ordinance that establishes duties underlying her cause of action for negligence.  Nor does she point to any other independent duty or standard of care found in California law that would support a cause of action for negligence.  In the circumstances, plaintiff has not met her burden on appeal to show the trial court erred in refusing to instruct the jury on this theory.

## DISPOSITION

The judgment is affirmed.

_____
TUCHER, J.

WE CONCUR:


_____
STREETER, Acting P. J.


_____
BROWN, J.


*Odulate v. Harkins* (A155889)

18